# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

DENNIS TAYLOR, et al. )
)
       Plaintiffs, )
) Case No. 14-CV-293-JED-FHM
v. )
)
MICHELIN NORTH AMERICA, INC., )
et al., )
)
       Defendants. )

## OPINION AND ORDER

Before the Court are several motions for partial summary judgment, filed by the defendants (Doc. 82, 85, 87) and the plaintiffs (Doc. 109). The Court conducted a hearing on the motions. Thereafter, the Oklahoma Department of Environmental Quality (ODEQ) was permitted to file an amicus curiae brief (Doc. 122-1, 124), to which the parties have responded (Doc. 126, 127). Also after the hearing, the plaintiffs filed an unopposed motion to amend to add a claim under the Resource Conservation and Recovery Act (RCRA) (Doc. 125), which the Court granted.

**I.    Background**

The plaintiffs in this action allege environmental contamination from toxins, including benzene, white gas, naptha, nickel, selenium, cyanide, carbon black, beryllium, mercury, tolene, lead, chromium, cadmium, asbestos, and polychlorinated biphenyl laden oil, which were allegedly released as a result of defendants' conduct, attempted containment, and remediation at the former tire manufacturing plant operated by B.F. Goodrich between 1945 and 1986 in Miami, Oklahoma. According to the plaintiffs, the toxins were deposited, stored, and/or discharged onto plant property, into a surface impoundment or lagoon, and in leaking underground storage tanks, and

the toxins migrated onto plaintiffs' real property or into their neighborhood south of the site of the plant.

Plaintiffs allege that they and their real properties "have been and continue to be contaminated with the deadly and dangerous toxins." (Doc. 55 at ¶ 2). Plaintiffs assert claims for nuisance, trespass, strict liability for ultra-hazardous activities, and unjust enrichment. As noted, plaintiffs have been permitted to amend to add claims under RCRA. Plaintiffs Dennis Taylor, Sean McDonald, Tika McDonald, and Niesha Fields seek to certify a medical monitoring class of Oklahoma citizens who reside or resided on certain defined real property within the City of Miami, bounded by specific street descriptions and called "Miami Heights," on the basis that the area has been significantly impacted by the release of benzene and other toxins. (*Id.* at ¶¶ 94-97). Although the action "does not seek damages for personal injuries," the putative class representatives "seek medical monitoring class damages," and all plaintiffs "seek recovery of real property damages." (*Id.* at ¶ 97). Plaintiffs also seek "equitable relief in the form of proper and permanent abatement and/or remediation of contaminated properties in Miami, Oklahoma" and injunctive relief requiring defendants "to remediate all contaminated properties." (*Id.* at ¶¶ 113, 145(g)).

The former Goodrich manufacturing plant was the subject of a 1995 lawsuit by the ODEQ in Ottawa County, Oklahoma. In that suit, the ODEQ asserted public nuisance claims, among others. (*See* Doc. 83-1). The ODEQ and defendant Michelin North America, Inc. (Michelin) entered into a Consent Order for Remediation on October 10, 1997, under which Michelin agreed to remediate the site of the former manufacturing plant. (Doc. 109-1). The Consent Order will terminate when the ODEQ notifies Michelin in writing that "the Work [required by the Consent Order] is complete." (*Id.* at ¶ 23). The parties to the Ottawa County lawsuit subsequently entered into a Settlement Agreement on March 25, 1998. (Doc. 83-2). Under the Settlement Agreement,

the defendants were obligated to remove certain contaminants from the property on which the plant was located. (*See id.* at 1). The Settlement Agreement also required the defendants to pay $170,000 to the State of Oklahoma and $5,000 to the City of Miami and provided that the parties would thereafter dismiss the lawsuit upon stipulations. (*Id.* at 2).

Following entry into the Settlement Agreement, facility sampling and analysis reports were completed in 2000, 2002, and 2003 (Doc. 83-4, 83-5, 83-6, 83-7). The defendants assert that they have continued to submit bi-annual monitoring reports regarding the groundwater plume under the plant site and residential area. (Doc. 82 at 6-7, ¶ 15). Following the plaintiffs' filing of this lawsuit in March of 2014, the defendants contend that they have continued to coordinate with ODEQ in ongoing remediation efforts. (*See* Doc. 83-8 [dated September 26, 2014]; 83-9 [dated April 17, 2015], and 83-10 [dated September 29, 2016]). ODEQ and the defendants have asserted that remediation efforts have been ongoing since 1997, and that the ODEQ has primary jurisdiction over plaintiffs' claims for equitable relief in this action. (*See* ODEQ amicus brief, Doc. 122-1; *see also* Doc. 121 at 6, ll. 2-4; Doc. 83). The plaintiffs have presented evidence, consisting of an expert's affidavit and a report relating to what plaintiffs allege to be continuing contamination of their properties and contamination beyond that previously acknowledged by the defendants. (*See* Doc. 94 at 11 et seq.).

**II.    Summary Judgment Standards**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for a

nonmoving party." *Anderson*, 477 U.S. at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. A non-movant's evidence is taken as true, with all justifiable and reasonable inferences drawn in the non-movant's favor. *Id*. at 255.

### III. Discussion

#### A. Defendants' Motions

##### 1. Remedy of Injunctive Relief

Defendants argue that the Court should grant summary judgment on plaintiffs' request for injunctive relief. According to the defendants, the ODEQ maintains primary jurisdiction over remediation or removal of contaminated groundwater migration, and ODEQ has been actively overseeing remediation at the site since 1997 when Michelin and the ODEQ entered into a Consent Order.

Plaintiffs respond that the Court should not rely upon the primary jurisdiction doctrine, based on plaintiffs' allegations the area has not been remediated as required, the contamination is continuing, the defendants misrepresented sampling results showing contaminants, and the area of contamination exceeds the boundaries of the remediation area. In addition, the plaintiffs note that the ODEQ and the Settlement Agreement are targeted only at the property / site on which the former manufacturing plant was located, rather than the plaintiffs' properties, in particular. The plaintiffs also point to their Third Amended Complaint, which they argue includes "serious unaddressed RCRA violations" that the ODEQ and defendants have not addressed. (*See* Doc. 127 at 4-7).

The primary jurisdiction doctrine permits a district court to refer a matter to the pertinent regulatory agency to allow the agency to make an initial determination. *Williams Pipe Line Co. v.*

*Empire Gas Co.*, 76 F.3d 1491, 1494, 1496 (10th Cir. 1996). When a claim "is originally cognizable in the courts, [primary jurisdiction] comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64 (1956). "The purposes of the doctrine are to: (1) ensure desirable uniformity in determinations of certain administrative questions; and (2) promote resort to agency experience and expertise where the court is presented with a question outside its conventional experience." *Williams*, 76 F.3d at 1496. When the doctrine applies, "the judicial process is suspended pending referral of such issues to the administrative body for its views." *Id.* at 1497 (quoting *Western Pac.*, 352 U.S. at 64).

The parties agree that the Court may consider five factors commonly suggested in the case law regarding primary jurisdiction. Those non-exclusive factors are: "(1) whether the court is being called upon to consider factual issues outside the conventional experience of judges; (2) whether defendant could be subject to conflicting orders; (3) whether agency proceedings have already begun; (4) whether the agency has shown diligence in resolving the issue; and (5) the type of relief requested." *B.H. v. Gold Fields Mining Corp.*, 506 F. Supp. 2d 792, 803 (N.D. Okla. 2007); *see* Doc. 82 at 9; Doc. 121 at 13-14 (discussing the factors).

The defendants argue that all of the factors favor primary jurisdiction in the ODEQ. With respect to the first factor, the ODEQ has more experience with respect to specific pollution remediation efforts than is the conventional experience of judges. The second factor – whether the defendants would be subject to conflicting orders – would also tend to weigh in favor of primary jurisdiction. However, there is currently no pending motion for preliminary injunctive relief, and the plaintiffs have merely included injunctive relief / abatement as one of the remedies they will ultimately seek following a determination of their claims on the merits. (*See* Doc. 55 at

¶¶ 113, 124, 145(g)). As a result, until the Court is presented with a request to enter injunctive relief prior to the conclusion of the case, the defendants are not, and will not be, subjected to any potentially conflicting orders. With respect to the third factor, ODEQ has been involved with the former B.F. Goodrich plant site since at least the 1997 Consent Order. The plaintiffs do not challenge the defendants' claim that the fifth factor falls on the side of primary jurisdiction.

As to the fourth factor, the plaintiffs assert that the ODEQ has been overseeing the defendants' remediation efforts for over 20 years, yet the site has not been sufficiently remediated, sampling data reflect that contaminants have migrated outside the zone of the remediation area, and at times the level of contaminants may have increased, rather than decreased, under the ODEQ's supervision. (*See* Doc. 94 at 1-2, 11-12; Doc. 127 at 3, n.1). Moreover, the plaintiffs have presented evidence that contamination from the plant exceeds the "non-detect" line which the defendants have represented to be the boundaries of the area of contamination from the plant. (*See* Doc. 94 at 1-2, 11-12). The plaintiffs' expert opines that Michelin has not adequately remediated, or been required by ODEQ to remediate, groundwater in the relevant surrounding residential areas. (*See id.* at 11-12, 26, n.2). Plaintiffs also note that the ODEQ's amicus briefing is focused on the "site" of the former plant, as opposed to off-site areas into the neighboring residential areas where the plaintiffs' properties are located. (Doc. 127 at 3). As a result, the plaintiffs argue that the fourth factor strongly undermines the defendants' primary jurisdiction argument.

The Tenth Circuit recently discussed the primary jurisdiction doctrine. "The primary jurisdiction doctrine allows courts to stay proceedings or dismiss an action without prejudice when 'a decision by a court would threaten the uniformity of a regulatory scheme or require the court to confront issues of fact outside of its conventional experience' so that the parties can 'seek a

decision before the appropriate administrative agency.'" *Benham v. Ozark Materials River Rock, LLC*, __ F.3d __, 2018 WL 1414897, *5 (10th Cir. 2018) (quoting *S. Utah Wilderness All. V. Bureau of Lang Mgmt.*, 425 F.3d 735, 751 (10th Cir. 2005)). Where there are facts indicating that an agency has not diligently pursued enforcement against the defendant, the primary jurisdiction doctrine will not necessarily prevent the Court from exercising jurisdiction. *See id.* In addition, where a problem or violation is continuing, a court may properly exercise jurisdiction over a plaintiff's suit. *See id.* at *6.

In response to the ODEQ's amicus briefing, the plaintiffs further point out that the purpose of the ODEQ enabling legislation is "to provide additional and cumulative remedies to prevent, abate and control pollution." *Okla. Stat.* tit. 27A, § 2-3-506(A). The statute expressly states that "[n]othing contained in this Code shall be construed to abridge or alter rights of action or remedies under the common law or statutory law, criminal or civil; nor shall any provision of this Code, or any act done by virtue thereof, be construed as estopping the state, or any municipality or person in the exercise of their rights under the common law to suppress nuisances or to abate pollution." *Okla. Stat.* tit. 27A, § 2-3-506(A); *see also id.*, § 2-3-506(C) ("Unless otherwise specified, the violations, remedies and penalties contained in this Code are in addition to those in the Environmental Crimes Act and other Oklahoma law.").

At this stage of the litigation, there remain genuine factual disputes regarding the areas and levels of contamination from the plant and the efficacy or inefficacy of historical remediation efforts under ODEQ oversight. There is currently no pending request for an order of injunctive relief or a request to grant an injunction before any trial on the merits of plaintiffs' claims. *See* Fed. R. Civ. P. 65. Thus, the Court concludes that the primary jurisdiction doctrine does not compel the dismissal or stay of any part of this action at this time. When the Court is called upon

7

to entertain injunctive relief – such as when the plaintiffs move for such relief or their claims are determined in their favor rendering injunctive relief ripe – the defendants may renew their request that the Court enter a stay of plaintiffs' request for injunctive relief. In the meantime, the Court does not intend to interfere with continuing remediation efforts undertaken with oversight by the ODEQ.

The defendants also argue that the plaintiffs' request for injunctive relief is barred by res judicata because of the 1997 Consent Order, which was the result of a lawsuit by the State of Oklahoma and the City of Miami, Oklahoma against Michelin and included allegations of a public nuisance. With respect to the defendants' res judicata argument, the plaintiffs note that they are seeking remedies for private, individual injuries and are not in privity with the State of Oklahoma or ODEQ with respect to their injuries and property damage.

Under Oklahoma law, claim preclusion, or res judicata, bars re-litigation of claims litigated on the merits in an earlier action between the parties or their privies. "The elements of claim preclusion are: 1) identity of subject matter and the parties or their privies in the prior litigation; 2) a court of competent jurisdiction heard the prior litigation; and 3) the judgment rendered in the prior litigation must have been a judgment on the merits of the case and not upon purely technical grounds." *Robinson v. Texhoma Limestone, Inc.*, 100 P.3d 673, 677, n.11 (Okla. 2004); *see also Katz v. Gerardi*, 655 F.3d 1212, 1218 (10th Cir. 2011) (claim preclusion "requires as one element a valid, final judgment on the merits").

The defendants do not argue that that the prior suit resulted in a final judgment on the merits, although they claim that the prior lawsuit by the State of Oklahoma and City of Miami included a public nuisance claim which has preclusive effect as to the plaintiffs' request for abatement of a nuisance. The Court has considered the documents cited by the defendants in

support of their res judicata argument, including the Consent Order, Settlement Agreement, and Dismissal related to the Ottawa County action. (*See* Doc. 83-2, 83-3, 38-1). Those documents do not satisfy the requisite element of a final judgment on the merits. There was no judicial determination of Michelin's liability or of the public nuisance claim asserted in that action. Michelin expressly disclaimed any liability or legal responsibility, including equitable liability:

> Michelin does not admit, and specifically denies, any liability to the Attorney General of Oklahoma, the Oklahoma Department of Environmental Quality or any other person or entity arising out of the allegations of the Complaint, nor does Michelin admit any facts, allegations, recitations or conclusions of law alleged in the Complaint or this Consent Order. Michelin also specifically denies any responsibility for the disposal of any hazardous substances or hazardous substance-containing materials at the Site and specifically denies any legal or equitable liability under any laws, regulations, ordinances or common law for any costs or damages incurred by any party in connection with the Site. . . .
>
> Neither entry into nor performance of this Consent Order shall constitute or be construed as an admission or acknowledgment by Michelin of any fact, legal issue or conclusion of law, or of any liability, fault or responsibility, or of a waiver of any rights, privileges, or defenses, or as evidence of such . . . and Michelin expressly denies any liability, fault or responsibility with respect to the Site. . . .
>
> This Consent Order does not attempt to determine the degree of contribution, if any, by Michelin and/or other parties to the environmental contamination of the Site.

(Doc. 38-1 at 1, 3, ¶¶ 3, 9, 11).

Similarly, in the Settlement Agreement, which was between the State, City, and B.F. Goodrich Company (Doc. 83-2), the company "denie[d] each and every claim made against it in the Lawsuit" and that agreement was a "compromise" – not a final judgment on the merits – "under which the claims and disputes are hereby resolved." (*Id.* at 1; *see also id.* at 3-4 ["Denial of Liability" and "Disputed Claims"]). The dismissal that was filed in the prior suit dismissed with prejudice claims for penalties or fines arising out of actions and omissions of B.F. Goodrich prior to the date of the settlement agreement and all claims related to PCBs at the property, but all other

9

claims associated with the property were dismissed without prejudice. (Doc. 83-3). These documents do not constitute a "final judgment on the merits," as is required for claim preclusion.

While the defendants' claim preclusion argument fails on the element requiring a final judgment on the merits, the defendants have also not established sufficient privity with the homeowners who are the plaintiffs in this case. Although a public nuisance was one of several claims asserted in that case, there was no indication that it was brought on behalf of the individual property owners and, as noted, there was no determination on the merits of that claim in any event. By its terms, the Consent Order provides that it "shall apply to and be binding upon [ODEQ] and [Michelin], their agents, successors, and assigns." (Doc. 38-1 at 2, ¶ 8). It does not purport to have been entered on behalf of the plaintiffs or to be binding on them. (*See id.*). Indeed, in response to the plaintiffs' motion for a determination that the defendants violated a requirement of the Consent Order, the defendants noted, accurately, that "[n]o plaintiff was a party to the [Consent Order]." (Doc. 113 at 4-5). Instead, the defendants argued that plaintiffs were "*strangers to the Consent Order*" and have no rights under it. (*Id.* at 5) (emphasis added).

The Settlement Agreement similarly provides that it "shall be binding on and shall inure to the benefit of the parties hereto and their respective successors and assigns," but is expressly *not* intended to "inure to the benefit of, or confer any rights upon, any third party other than the parties' respective successors and assigns, including their present and former agents, employees, officers, directors, and/or attorneys." (Doc. 83-2 at 4, ¶ D). The Settlement Agreement provided for payments totaling $175,000 to the State of Oklahoma and the City of Miami – not to the plaintiffs. The defendants have not established that any of plaintiffs' claims are subject to claim preclusion.

Hence, the defendants' motion for partial summary judgment (Doc. 82) is **denied** at this time, without prejudice to the defendants renewing their request that the Court reconsider their

primary jurisdiction arguments if and when the Court is asked to enter an order that may conflict with ODEQ's oversight of ongoing remediation efforts.

### 2. Medical Monitoring

Defendants raise the same arguments as were raised in their prior motion to dismiss plaintiffs' medical monitoring claims, asserting that Oklahoma courts have not recognized such claims in the absence of proof of physical injury. The Court denied the defendants' prior motion because the plaintiffs had suggested that they had suffered some physical injury attributable to contamination from the former B.F. Goodrich plant. Thus, the Court noted that it would be more appropriate to determine the medical monitoring issue on the summary judgment record:

> Plaintiffs have not presented any authorities that recognize the availability of medical monitoring in the absence of present physical injuries or disease. However, they assert that they have not disavowed the presence of physical injuries and that some of them have in fact suffered such injuries. Plaintiffs also reference Judge Heaton's statement in *Reece* that, "[o]nce physical injuries are established, plaintiffs will be allowed to seek necessary future medical expenses, which may include monitoring on an individual basis." *Reece [v. AES Corp.]*, [No. CIV-12-0457-JH,] 2014 WL 61242, *7 [(W.D. Okla. Jan. 8, 2014)]; *see also McCormick v. Halliburton*, 895 F. Supp. 2d 1152, 1159 (W.D. Okla. 2012) (granting "judgment on the pleadings as to plaintiffs' requests for medical monitoring relief *for any plaintiffs other than those who claim to be presently injured*.") (emphasis added). These qualifying statements by Judges Heaton and Miles-LeGrange reflect the difficulty in dismissing such a remedy at the pleading stage, where evidence is not typically required to maintain a request for a particular remedy which may be available under certain facts but not others. Moreover, there is a pending summary judgment motion by the defendants on the issue of medical monitoring (Doc. 85), and the Court concludes that it would be more appropriate to consider the issues relating to that remedy on the summary judgment record.

(Doc. 117 at 3).

The defendants assert that the plaintiffs cannot maintain a medical monitoring claim because they have not presented any evidence that any plaintiff has suffered a physical injury caused by exposure to any substance emanating from the plant. (Doc. 85 at 2; *see also* Doc. 86 at 1, ¶ 3). The plaintiffs assert that they need discovery to establish medical issues and causation.

11

However, such evidence of any maladies the plaintiffs may have is within the control of the plaintiffs, and they have not been prevented from presenting such evidence. Their Second Amended Complaint expressly states that "[t]his action does not seek damages for personal injuries," as does their Third Amended Complaint the filing of which the Court recently authorized. (*See* Doc. 55 at 15, ¶ 97; Doc. 125 at 20, ¶ 101).

In response to the defendants' motion, plaintiffs cite evidence that includes discovery responses identifying various physical problems, but plaintiffs have not provided *any* evidence that such conditions were caused by contaminants from the B.F. Goodrich site. (*See* Doc. 95 at 5-6). They include vague allegations that "contaminants have affected them in many ways," "affected their health, safety and welfare," and that they have "had to deal with many medical issues since they have resided on the property," including blisters, infections, headaches, fatigue, aches and pains, sleep disturbance, abnormal blood cell counts, heart arrhythmia, and tooth decay. (Doc. 95-2 at 3-4). In addition, the infant son of plaintiffs Sean and Tika McDonald was diagnosed shortly after birth with pyloric stenosis, which they have been told is "an exceedingly rare" condition in infants their son's age. (*Id.* at 4). Plaintiffs submitted a 2016 CT neck scan of plaintiff Niesha Fields that revealed a "left lower neck mass and a left supraclavicular mass" (Doc. 95-5), but presented no evidence that the masses were caused by any contaminant. In short, the plaintiffs have not yet presented evidence of physical injuries attributable to contaminants from the plant.

Accordingly, the defendants' motion (Doc. 85) is **granted**, and the plaintiffs' medical monitoring class allegations are dismissed without prejudice.[1]

---

[1] Dismissal without prejudice is appropriate to the extent that this decision does not foreclose an individual plaintiff from seeking future medical expenses upon discovering and proving a medical condition caused by contamination from the plant. *See Reece*, 2014 WL 61242 at *7. This order does not address the merits of such a claim, because no such claim is before the Court.

### 3. Plaintiffs Who Purchased Properties after February 2002

The defendants seek summary judgment with respect to 52 plaintiffs in this action who acquired their properties after February 2002. Their motion is premised upon an argument that, by February 2002, there had been "extensive publicity regarding hydrocarbon contamination in the residential areas south of Goodrich Boulevard, including numerous media reports, a door-to-door survey of houses in the area, and several individual letters to residents." (Doc. 87 at 2). According to the defendants, because those 52 plaintiffs purchased their properties after February 2002, "the market already reflected any diminished value at the time of their purchases." (*Id*.).

As evidence, the defendants cite the following: (1) a November 2, 2001 Tulsa World article referring to ODEQ testing around the former B.F. Goodrich plant because one water sample showed elevated levels of benzene; (2) door-to-door surveys conducted in November 7 and 8, 2001 of properties near the plant, during which a Michelin agent allegedly provided an "information letter" about "possible environmental concerns"; (3) a January 21, 2002 letter mailed to residents in the area, which included a map showing the location of the plume and informed residents of a public meeting scheduled for February 19, 2002; (4) a February 18, 2002 article in The Oklahoman (a newspaper) reporting concerns of contamination south of the plant and referencing the public meeting to occur the next day; (5) a February 19, 2002 report on Tulsa's NewsOn6 website that "[a]bout 50 people, along with state and local officials were on hand" at the meeting and that there had been evidence of benzene contamination of groundwater; and (6) a February 20, 2002 article in The Oklahoman further reporting on the public meeting. (*See* Doc. 87 at 3-6, ¶¶ 5-13).

Plaintiffs respond that the defendants have not properly supported their allegations that the 52 plaintiffs purchased their properties at a diminished price that was reflected in market value or

that the plaintiffs have suffered no diminution damages resulting from the defendants' actions. (*See* Doc. 96 at 1 [quoting Doc., 87 at 2]). The Court agrees, for several reasons.

First, the defendants have presented no evidence that the 52 plaintiffs who purchased after February 2002 had notice of the letters or press reports or that the price they paid reflected an already diminished value accounting for contamination from the former B.F. Goodrich plant. There is no evidence in the summary judgment record that those 52 plaintiffs had notice such that the price they were willing to pay as willing buyers reflected a diminution in value. The defendants' evidence does not account for purchasers who did not see the reports or letters because (1) they did not take the Oklahoma newspapers between November 2, 2001 and February 20, 2002, (2) they did not receive the letters as they did not yet live in the area south of the plant where the letters were distributed, or (3) they moved to Oklahoma from other states or countries. In addition, the defendants have not presented evidence that the amount any other willing buyers would have paid for those properties after February 2002 had been diminished by the referenced notices.

Second, there are factual disputes as to the extent of continuing contamination and the accuracy of the disclosures about such contamination in the press reports and letters cited by the defendants. Thus, even if the defendants had presented evidence that purchase prices after February 2002 had already reflected a diminished fair market value (which they have not), those plaintiffs purchasing after that date may be permitted to seek damages of any *further diminution* in value that may have occurred since they purchased their properties.

Third, the news accounts and letters did not report definitive contamination that would necessarily affect property values at the time. For example, the November 2, 2001 Tulsa World article referred to *one* water sample and "*possible* contamination" that "*could be* moving underneath the ground south" of the plant site, and indicated that additional testing samples had

been requested and "will be analyzed to find out what is there." (Doc. 88-4 at 23-24) (emphasis added). The November 7, 2001 letter referred to an ongoing "process of working" to "identify[ ] water wells, basements or other underground structures . . . which *may be* impacted. (*Id.* at 49) (emphasis added).

The evidence presents a genuine dispute as to the material facts, including (1) whether any diminution in value of the 52 plaintiffs' properties was already accounted for by February 2002 and (2) even if property purchase prices for those 52 plaintiffs had reflected a diminished property value, whether there has been further diminution in value due to any continuing contamination / nuisance. Accordingly, the defendants' motion (Doc. 87) is **denied**.

B. **Plaintiffs' Motion**

Plaintiffs seek partial summary judgment as to defendants' alleged violation of the 1997 Consent Order. Plaintiffs allege that the Consent Order required that the defendants obtain written site access agreements from all property owners in Miami, Oklahoma, and that the defendants failed to obtain such agreements. In response, the defendants assert that (1) the issue is extraneous and irrelevant to this case, (2) plaintiffs were not parties to the Consent Order and have no standing to assert any argument regarding alleged violations of that order, (3) the terms of the Consent Order require only that Michelin use its "best efforts" to obtain such site agreements, and such agreements were not required to be written, and (4) plaintiffs have not provided any evidence showing a violation of the Consent Order.

The Consent Order provides that "[t]o the extent that the Site is presently owned in whole or in part by parties other than those bound by this Consent Order, Michelin will obtain, or use its best efforts to obtain, site access agreements from the present owner(s), to the extent such access is necessary pursuant to the Work Plan." (Doc. 109-1 at 4, ¶ 27). The Consent Order also provides

15

that ODEQ "may obtain access for Michelin." (*Id.*). Paragraph 28 of the Consent Order further provides the terms that are to be included in such access agreements. (*Id.* at ¶ 28).

Other than merely arguing that Michelin did not comply with the Consent Order by obtaining site access agreements, plaintiffs have not presented any evidence or authority establishing the propriety of granting summary judgment in their favor with respect to that issue. The plain terms of the Consent Order include contingencies relating to the access agreements, and the plaintiffs have not established a violation of those terms. (*See* Doc. 109-1 at 4, ¶ 27) (providing that Michelin "will obtain, *or use its best efforts to obtain*, site access agreements . . . *to the extent such access is necessary pursuant to the Work Plan.*") (emphasis added). The plaintiffs have not presented evidence sufficient for the Court to determine that Michelin failed to comply with that provision. Moreover, it is unclear whether that issue is material to the plaintiffs' claims. Accordingly, the plaintiffs' motion (Doc. 109) is **denied**.

IV. **Conclusion**

For the foregoing reasons, defendants' motion for partial summary judgment as to the plaintiffs' medical monitoring class allegations (Doc. 85) is **granted**, and the parties' other motions for partial summary judgment (Doc. 82, 87, 109) are **denied**.

The stay of discovery, which was granted "pending the Court's determination of the pending dispositive motions" (Doc. 118) is hereby **lifted**. The parties shall file a Joint Status Report by **April 30, 2018**.

SO ORDERED this 30th day of March, 2018.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE